UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RALPH MCCONNELL, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JOSE E. TORRES, J.F. SIKORSKI, )<br>A.J. MARTIN, and the CITY OF )<br>CHICAGO )<br>)<br>Defendants. ) | Case No. 16 C 5519<br><br>Honorable Samuel Der-Yeghiayan |

### PLAINTIFF'S THIRD AMENDED COMPLAINT AND JURY DEMAND

For his Third Amended Complaint against defendants Jose E. Torres, J.F. Sikorski, A.J. Martin, and the City of Chicago, plaintiff Ralph McConnell alleges as follows:

1. On October 20, 2014, Mr. McConnell was arrested in the City of Chicago, Illinois by one of the Chicago Police Department's ("CPD") officers. He refers to this arresting officer as the "Officer."

2. Upon information and belief, the Officer is one of defendants Jose Torres, J.F. Sikorski, and A.J. Martin, each a CPD officer. Their star numbers are 19898, 11143, and 14313, respectively.

3. On October 20, 2014, defendant City of Chicago was a municipal corporation, and the principal employer of the Officer, who was acting in the course and scope of his employment with the City of Chicago when he arrested Mr. McConnell on October 20, 2014. The CPD is an agency of the City. Mr. McConnell brings his claims against the City under *Monell v. Dep't of Social Serv.*, 436 U.S. 658 (1978).

1

4. Mr. McConnell brings his claims against the Officer and the City pursuant to 42 U.S.C. § 1983 for violations of his rights under the fourth and fourteenth amendments of the U.S. constitution.

5. Pursuant to 28 U.S.C. § 1331, the federal courts have subject-matter jurisdiction over the lawsuit at bar.

6. Pursuant to 28 U.S.C. § 1391, venue in this district is proper for the lawsuit at bar.

7. Exhibit A to Mr. McConnell's Third Amended Complaint is a true and correct copy of the CPD's Special Order S04-16, which, upon information and belief, is the sole writing documenting the rules and regulations that govern the CPD's policy of issuing documents that are known as "investigative alerts."

8. Upon information and belief, ever since March 2001, the CPD has used investigative alerts to identify subjects for CPD officers to investigate.

9. Upon information and belief, the CPD has intended and does intend for its officers to arrest some subjects of an investigative alert on the basis of that investigative alert alone, without first procuring an arrest warrant for those subjects.

10. Special Order S04-016 does not expressly require the officer requesting an investigative alert to state whether or not probable cause existed to arrest the subject of that alert.

11. Special Order S04-016 does not expressly require the supervisor who approves an investigative alert to state whether or not probable cause existed to arrest the subject of that alert.

12. Upon information and belief, CPD officers at times have been and are uncertain whether a given investigative alert claims probable cause to arrest.

13. Upon information and belief, CPD officers at times have relied on investigative alerts to effectuate arrests that lacked probable cause.

14. Upon information and belief, the CPD has issued investigative alerts that claim probable cause to arrest the subject of that alert, and officers of the CPD, without procuring an arrest warrant first, have arrested some of those subjects in reliance on the investigative alert claiming probable cause.

15. Upon information and belief, an officer of the CPD detained, searched, and arrested Eddie and Yvonne Freeman on October 5, 2013 in reliance on an investigative alert.

16. Upon information and belief, there was no probable cause to arrest Mr. or Mrs. Freeman on October 5, 2013.

17. Upon information and belief, an officer of the CPD detained, searched, and placed in custody Keenan Jones on May 6, 2012 in reliance on an investigative alert.

18. In a decision upheld by the Illinois Appellate Court, the Illinois Circuit Court concluded that there was no probable cause to detain, search, and place in custody Mr. Jones on May 6, 2012.

19. Upon information and belief, an officer of the CPD arrested Kraig Hyland on January 13, 2010 in reliance on an investigative alert that claimed probable cause to arrest Mr. Hyland.

20. The Illinois Appellate Court decided that the State of Illinois failed to show probable cause to arrest Mr. Hyland on January 13, 2010.

21. Upon information and belief, an officer of the CPD arrested Frank Craig in May 2006 in reliance on an investigative alert that claimed probable cause to arrest Mr. Craig.

22. The Northern District of Illinois concluded that there was no probable cause to arrest Mr. Craig in May 2006.

23. In at least three cases, the majority of a panel of the Illinois Appellate Court has

questioned the constitutional validity of the CPD's policy of using investigative alerts to effectuate arrests. Those cases are *People v. Jones*, 2015 IL App (1st) 142997, *People v. Starks*, 2014 IL App (1st) 121169, and *People v. Hyland*, 2012 IL App (1st) 110966 (Salone, J. concurring, joined by Neville, J.).

24. In *Jones*, the Illinois Appellate Court noted that the CPD's policy of using investigative alerts "remains just as troubling as well as unresolved" and stated that "[h]opefully the issue will be addressed on appeal at some point."

25. No court has ever upheld the constitutionality of the CPD's policy of using investigative alerts.

26. On the morning of October 20, 2014, Mr. McConnell was inside his home in Chicago at 6351 South Artesian Avenue, unit 1, about to eat breakfast with his family, when the Officer entered Mr. McConnell's home.

27. The Officer did not have a warrant permitting him to enter Mr. McConnell's home on the morning of October 20, 2014.

28. The Officer did not have permission from any occupant of Mr. McConnell's home to enter Mr. McConnell's home on the morning of October 20, 2014.

29. There were no exigent circumstances to justify the Officer's entry into Mr. McConnell's home on the morning of October 20, 2014.

30. Upon entering Mr. McConnell's home on the morning of October 20, 2014, the Officer stated that Mr. McConnell was the subject of an investigative alert.

31. The Officer then searched and handcuffed Mr. McConnell inside his home and escorted him to a police cruiser outside of his home.

4

32. When Mr. McConnell asked the Officer why he was arresting Mr. McConnell, the Officer answered that he was just doing his job, without giving Mr. McConnell an explanation for why Mr. McConnell was placed under arrest.

33. As a consequence of his arrest on the morning of October 20, 2014, Mr. McConnell has been unable to work for income, his health has deteriorated, and he has suffered emotional distress.

**Count I – False Arrest by the Officer**

34. Mr. McConnell re-alleges paragraphs 1 through 33.

35. Mr. McConnell brings this Count against the Officer, who is Ofr. Torres, or in the alternative, Ofr. Sikorski, or in the alternative, Ofr. Martin.

36. The Officer acted under color of law when he arrested Mr. McConnell on the morning of October 20, 2014.

37. The Officer lacked probable cause to arrest Mr. McConnell on the morning of October 20, 2014.

38. The Officer is liable to Mr. McConnell for compensatory, nominal, and/or punitive damages for his false arrest of Mr. McConnell.

**Count II – Warrantless Arrest in Mr. McConnell's Home by the Officer**

39. Mr. McConnell re-alleges paragraphs 1 through 33.

40. Mr. McConnell brings this Count against the Officer, who is Ofr. Torres, or in the alternative, Ofr. Sikorski, or in the alternative, Ofr. Martin.

41. Without (i) a warrant to enter Mr. McConnell's home to effect an arrest, (ii) permission to enter Mr. McConnell's home, or (iii) exigent circumstances to justify his entry

into Mr. McConnell's home, the Officer entered Mr. McConnell's home on the morning of October 20, 2014 and arrested Mr. McConnell in his home.

42. The Officer is liable to Mr. McConnell for compensatory, nominal, and/or punitive damages for unjustifiably entering Mr. McConnell's home and arresting him there.

**Count III – The City's Express Policy of Effecting Arrests Pursuant to Investigative Alerts**

43. Mr. McConnell re-alleges paragraphs 1 through 38.

44. Mr. McConnell brings this Count against the City.

45. The CPD at times has effectuated and effectuates arrests in reliance on investigative alerts, which need not be supported by probable cause, in lieu of warrants.

46. This reliance caused the false arrest of Mr. McConnell on the morning of October 20, 2014.

47. The City is liable to Mr. McConnell for compensatory, nominal, and/or punitive damages for the CPD's reliance on its investigative-alert policy.

**Count IV – The City's Express Policy of Effecting Arrests Pursuant to Investigative Alerts**

48. Mr. McConnell re-alleges paragraphs 1 through 38.

49. Mr. McConnell brings this Count against the City.

50. The CPD's express policy for investigative alerts permits the issuance of investigative alerts that do not specify whether or not the officer requesting the alert, or the supervisor approving the alert, believes probable cause to exist to effectuate an arrest of the alert's subject.

51. By its issuance of investigative alerts that do not specify whether or not there is probable cause to effectuate an arrest, the CPD foreseeably causes arrests that lack probable cause.

52. Upon information and belief, the investigative alert identifying Mr. McConnell as its subject did not specify whether or not probable cause existed to arrest him.

53. In reliance on this investigative alert, the Officer falsely arrested Mr. McConnell on the morning of October 20, 2014, a foreseeable result of the CPD's investigative-alert policy.

54. The City is liable to Mr. McConnell for compensatory, nominal, and/or punitive damages for the CPD's reliance on its investigative-alert policy.

### Count V – The City's Custom and Usage of Its Investigative-Alerts Policy

55. Mr. McConnell re-alleges paragraphs 1 through 38.

56. Mr. McConnell brings this Count against the City.

57. The CPD's custom and usage, though its effectuation of warrantless arrests pursuant to investigative alerts, foreseeably leads to arrests unsupported by probable cause.

58. The City is liable to Mr. McConnell for compensatory, nominal, and/or punitive damages for the CPD's reliance on its investigative-alert policy.

*   *   *   *   *

For these reasons, Ralph McConnell respectfully requests entry of judgment against Jose E. Torres, or in the alternative, J.F. Sikorski, or in the alternative, A.J. Martin, and against the City of Chicago, awarding him damages and such other relief as the Court sees fit.

**Jury Demand**:  Mr. McConnell demands a trial by jury.

Dated January 24, 2017                              Respectfully submitted,

          /s/ Patrick Frye

Patrick Frye
FREEBORN & PETERS
311 South Wacker Drive, Suite 3000
Chicago, IL  60606
(312) 360-6000

*Attorney for Ralph McConnell*

3768068v1/99900-0627

# Exhibit A

| | Chicago Police Department | **Special Order S04-16** |
|---|---|---|
| | **INVESTIGATIVE ALERTS** | |

| **ISSUE DATE:** | 05 March 2001 | **EFFECTIVE DATE:** | 06 March 2001 |
|---|---|---|---|
| **RESCINDS:** | G01-02 | | |
| **INDEX CATEGORY:** | Preliminary Investigations | | |

I. **PURPOSE**

   This directive

   A. discontinues the use of the term "stop order" and replaces it with the term "**investigative alert**."

   B. discontinues the use of the Stop Order or Cancellation Request form (CPD-31.961).

   C. defines categories of investigative alert.

   D. introduces the **Criminal History Records Information System (CHRIS) Investigative Alert Application System** to be utilized by the Bureau of Investigative Services (BIS).

   E. informs members of the availability of investigative alert data via CHRIS and local Hot Desk name checks.

   F. delineates responsibilities of BIS and the Identification Section.

   G. outlines procedures when processing investigative alerts and Temporary Wants.

II. **CHRIS INVESTIGATIVE ALERT APPLICATION SYSTEM**

   All requests for investigative alerts are entered and approved in CHRIS by sworn BIS personnel. Any BIS member with a responsibility for follow-up investigation may request an investigative alert via the CHRIS Investigative Alert Application System.

   A. Members will enter investigative alert requests into CHRIS utilizing the investigative alert application screen. Each person wanted must be entered separately.

   B. Supervisors will approve or reject investigative alert requests in CHRIS.

   C. An investigative alert is effective immediately upon approval and is available to Department members via CHRIS or Hot Desk name checks.

   D. CHRIS and Hot Desk name checks will display investigative alert and pertinent investigative alert data (i.e., required data listed in Item II-F of this directive) whenever a name check is run on an individual who has an investigative alert on file.

   E. The unit investigative alert file will be audited in accordance with Item III-A-6 of this directive to ensure that investigative alerts no longer needed are purged from the Investigative Alerts Application System.

   F. The following data is required to request an investigative alert:

      1. Offense code

      2. Name of subject (include all known aliases)

3. IR number

4. Physical description (sex, height, DOB, etc.)

5. Last known address

6. Justification for the investigative alert request

7. Requesting member's information (name, star number, unit, etc.)

8. RD number, in all instances that one has been issued.

## III. RESPONSIBILITIES

A. Bureau of Investigative Services

Bureau of Investigative Services supervisors will ensure that:

1. a unit investigative alert file is maintained. The investigative alert file will contain sufficient information relating to the subject of the alert to allow any member of the investigating unit to handle the investigation if the requesting member is not available. Copies of all reports, documents, etc., supporting the investigative alert request and a summary of how the subject was involved in the crime or incident will also be included in the investigative alert file.

2. a copy of the subject's most recent photograph, if available, is attached to a paper copy of the approved investigative alert request and placed in the unit investigative alert file.

3. a current list of investigative alerts requested by the unit is maintained.

4. in the event a juvenile is involved or is alleged to be involved in an offense, every effort is made to apprehend the juvenile before an investigative alert is requested. This will include requesting that area Special Victims Section personnel search their files for pertinent information which would assist in the apprehension of the juvenile.

   **NOTE:** Members will follow the procedures outlined in the Department directive entitled "Processing of Juveniles and Minors Under Department Control" when processing or interrogating juveniles.

5. investigative alert requests are updated or canceled as necessary.

   **NOTE:** Any BIS member of the rank of sergeant or above is authorized to update or cancel an investigative alert.

6. the unit investigative alert file is audited each police period to ensure investigative alert requests on file are canceled when the subject of the alert has been apprehended or the investigative alert is no longer needed.

7. Temporary Want entry requests are telephoned or faxed to the Field Inquiry Section - Central Warrant Unit to be entered into the LEADS and/or NCIC computer systems.

        8.    the Help Desk is contacted if there is a problem with the CHRIS Investigative Alert Application System.

    B.    Identification Section

        If a fingerprint verification of an arrestee's identity indicates that an investigative alert is in effect, the Identification Section will immediately make notifications to both the district of detention and the unit which originated the investigative alert.

        **NOTE:** The Identification Section will notify the Cook County Fugitive Unit upon verification that the arrestee is a participant (inmate or offender) in an electronic home monitoring detention program supervised by the Illinois Department of Corrections, probation supervisory authority, sheriff, or any other office charged with authorizing and supervising home detention.

**IV.    PROCESSING INVESTIGATIVE ALERTS AND TEMPORARY WANTS**

    A.    Field Officers

        1.    Officers who run name checks on individuals who have an **Investigative Alert / Probable Cause to Arrest** on file will:

            a.    take the subject into custody if not already in custody.

            b.    process the arrestee in accordance with the procedures outlined in the Department directive entitled "Processing Persons Under Department Control." Indicate on the Arrest Report (CPD-11.420) that the arrestee is the subject of an Investigative Alert / Probable Cause to Arrest.

            c.    notify the desk sergeant of the incident.

            d.    notify the requesting BIS member's unit that the subject is in custody and indicate on the Arrest Report the name and star number of the investigating member notified.

                **NOTE:** If the investigative alert is for an arrestee who is a participant in an electronic home monitoring detention program, the officer will notify the Identification Section.

        2.    Officers who run name checks on individuals who have an **Investigative Alert / No Probable Cause to Arrest** on file are reminded that **IF NO OTHER CRIME WAS COMMITTED, AN ARREST IS NOT AUTHORIZED.** Officers will:

            a.    inform the individual that a BIS investigative member seeks to interview the individual about a specific police matter and request that the subject **voluntarily** accompany the officer(s) to the district station to speak with the investigating officer so that the matter may be resolved.

            b.    if the individual consents, the officer will assist the individual to the district station, and:

                1.    notify the desk sergeant of the incident.

                2.    notify the requesting member's unit indicating that the subject of the investigative alert is at the district station voluntarily and has consented to speak with the investigating member.

       3. complete an **Information Report (CPD-11.461)** documenting the incident. Include the pertinent investigative alert data and indicate that the subject voluntarily accompanied the officer to the district station.

       4. forward a copy of the Information Report to the requesting BIS member's unit.

       5. forward the original Information Report to the Office of the Assistant Superintendent, Operations.

   c. if the individual will not voluntarily accompany the officer(s) to the district station:

       1. complete an Information Report documenting the incident and include the pertinent data obtained from the investigative alert.

         **NOTE:** **IF NO OTHER CRIME WAS COMMITTED, AN ARREST IS NOT AUTHORIZED.**

       2. notify the desk sergeant of the incident.

         **NOTE:** **DO NOT DETAIN SUCH PERSONS IN ORDER TO MAKE NOTIFICATIONS.**

       3. notify the requesting member's unit that the subject was located.

       4. forward a copy of the Information Report to the BIS requesting member's unit.

       5. forward the original Information Report to the Office of the Assistant Superintendent, Operations.

   d. if the subject is in custody for some other offense and a name check reveals Investigative Alert / No Probable Cause to Arrest, the officer(s) will:

       1. notify the requesting BIS member's unit that the subject is in custody.

         **NOTE:** It is not necessary to complete an Information Report if the subject has been arrested for some other offense and a name check reveals Investigative Alert / No Probable Cause to Arrest.

       2. document the Investigative Alert / No Probable Cause to Arrest and the name and star number of the investigating member notified on the Arrest Report.

3. Officers who run name checks on individuals who have a **Temporary Want** on file will:

   a. take the wanted person into custody if not already in custody.

   b.

            process the arrestee in accordance with the procedures outlined in the Department directive entitled "Processing Persons Under Department Control."

      c.   contact the Field Inquiry Section - Central Warrant Unit for direction on how to proceed with the Temporary Want arrest.

      d.   ensure that either the warrant information or the basis for probable cause has been articulated on the arrest report as soon as that information is available and prior to the arrestee being sent to court.

B.   **Watch Commanders**
If a person in custody is the subject of an investigative alert or Temporary Want, watch commanders will ensure that:

  1.   the investigative alert is investigated before an arrestee is let to bail.

      **NOTE:**   Whenever the detention of a person in Department custody would result in the subject being held more than **48 hours** from the time of arrest **and** the subject was arrested without a warrant **and** the approval of charges has not occurred, the subject must be **either** released without charging **or** sent before the appropriate court for a determination of probable cause. Members will refer to the Department directive entitled "Processing Persons Under Department Control" for further guidance.

  2.   the requesting BIS member's unit is notified.

  3.   the requesting BIS unit responds or notifies the district of detention if the investigative alert is no longer in effect.

  4.   the Identification Section is notified if the arrestee is a participant in an electronic home monitoring detention program.

  5.   the Field Inquiry Section - Central Warrant Unit is contacted for directions on procedures to be followed whenever a Temporary Want arrest is made.

C.   **Bureau of Investigative Services**
Bureau of Investigative Services sworn members will:

  1.   respond to the district station immediately upon notification that the subject of an investigative alert is in custody or at the district station on a voluntary basis (if the individual is the subject of an Investigative Alert / No Probable Cause to Arrest).

  2.   conduct follow-up investigations relative to information received from investigative alert Information Reports.

  3.   ensure that a supervisor is notified in the event an investigative alert is to be updated or canceled (i.e., additional information is available, a warrant has been served and the investigative alert is no longer necessary, complainant/witness is no longer available, etc.).

D.   **Field Inquiry Section - Central Warrant Unit**
When processing Temporary Wants, the Central Warrant Unit will:

  1.   enter Temporary Want requests into the LEADS and/or NCIC systems.

2. include any additional information and all known aliases.

3. place a copy of the Temporary Want request into the warrant file after entry has been made into the systems.

4. include a list of active Temporary Wants in the LEADS, NCIC or Hot Desk systems within the weekly listing of active warrants provided the Detective Division.

Terry G. Hillard
Superintendent of Police

00-113 ZMM(PMD)